IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) Case No. 2:07CR00015 |
| v. | ) |
| | ) **OPINION AND ORDER** |
| **DANIEL DOVE,** | ) |
| | ) By: James P. Jones |
| Defendant. | ) Chief United States District Judge |

*Tyler G. Newby, Trial Attorney, United States Department of Justice, Washington, D.C., Randy Ramseyer, Assistant United States Attorney, Abingdon, Virginia, and Jay V. Prabhu, Assistant United States Attorney, Alexandria, Virginia, for the United States; Michael B. Gunlicks, Gunlicks Law, L.C., Richmond, Virginia, for Defendant.*

In this criminal copyright infringement case, I find that the government has failed to prove the amount of actual loss sustained by the victims and accordingly I am unable to require that the defendant pay restitution.

I

The Indictment in this case charged the defendant, Daniel Dove, with being a high-level member of an Internet piracy organization known as "Elite Torrents" during the years 2004 and 2005. The government contended at trial that the defendant had participated in the reproduction and distribution of pirated copyrighted movies, software programs, and video games. Members of the Elite Torrents group were able to download movies, music, and other copyrighted media for free, so long

as they allowed other users to access copyrighted material stored on their computers. The defendant did not contest being involved in the Elite Torrents group, but denied that he knew that his conduct was illegal.

A jury found the defendant guilty of criminal copyright infringement under 17 U.S.C.A. § 506(a)(1)(A) (West 2005). The jury concluded that the offense consisted of "the reproduction or distribution, including by electronic means, during any 180-day period, of at least 10 copies or phonorecords, of 1 or more copyrighted works, which have a total retail value of more than $2,500," making the offense punishable under 18 U.S.C.A. § 2319(b)(1) (West Supp. 2008). In addition, the defendant was found guilty of conspiracy to commit criminal copyright infringement under the general conspiracy statute, 18 U.S.C.A. § 371 (West 2000).

I sentenced the defendant to eighteen months imprisonment on each count, to be served concurrently. The defendant was also ordered to pay a special assessment of $200 and a fine in the amount of $20,000, consisting of $10,000 on each count. Prior to the sentencing hearing, two victims, the Recording Industry Association of America ("RIAA") and Lionsgate Entertainment, Inc. ("Lionsgate"), submitted requests for restitution. I reserved determination of restitution to allow the parties and any victims to submit to the court additional argument or information regarding the amount of restitution. The issues presently before the court are whether Dove's

offenses require mandatory restitution to be paid to the victims, and if so, whether the government and the victims have adequately proven the amount of actual loss for restitution purposes. The government and RIAA, one of the victims, have briefed these issues, and they are ripe for decision.[1]

II

There is no special restitution statute for copyright infringement, so that the general restitution statutes, 18 U.S.C.A. §§ 3663, 3663A (West 2000 & Supp. 2008), will determine whether restitution is appropriate in this case. The Mandatory Victims Restitution Act of 1996 ("MVRA") requires restitution for (1) "an offense against property under [title 18]," § 3663A(c)(1)(A)(ii), in which (2) "an identifiable victim or victims has suffered a . . . pecuniary loss," § 3663A(c)(1)(B), and (3) the court has not found that the number of identifiable victims or the complexity of determining causation or the amount of the victims' losses would make restitution impracticable, § 3663A(c)(3).

In order for the MVRA to apply, the defendant must be guilty of an offense against property under title 18. § 3663A(c)(1)(A)(ii). The core offense of criminal

---

[1] The defendant did not submit a brief on these issues, but did make some relevant arguments during the sentencing hearing.

copyright infringement, 17 U.S.C.A. § 506(a)(1)(A), falls under title 17. However, the jury had to find additional facts in order to punish the defendant under 18 U.S.C.A. § 2319(b)(1), which is within title 18. *See United States v. Chalupnik*, 514 F.3d 748, 752 n.1 (8th Cir. 2008) (declining to consider the defendant's argument that the MVRA did not apply to criminal copyright infringement because the argument was not timely raised, and noting that although the offense is under title 17, it is punished under title 18). Courts, including the Fourth Circuit, have applied the MVRA to criminal copyright infringement cases without discussing the issue. *See, e.g.*, *United States v. Adams*, 19 F. App'x. 33, 35 (4th Cir. 2001) (unpublished) (applying the MVRA, but finding restitution inappropriate because there was no pecuniary loss).

The defendant was also convicted of conspiracy to engage in criminal copyright infringement under the general conspiracy statute, 18 U.S.C.A. § 371. Conspiracy is considered an offense against property under title 18 when "[t]he underlying predicate acts and purposes that constituted the conspiracy were an offense against property." *United States v. Quarrell*, 310 F.3d 664, 678 (10th Cir. 2002). Since Dove's conspiracy was predicated on a crime against property, criminal

copyright infringement, the conspiracy count satisfies the MVRA requirement of an offense against property under title 18.[2]

The MVRA requirement that "an identifiable victim or victims has suffered a . . . pecuniary loss," § 3663A(c)(1)(B), has also been satisfied. "[T]he term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," including anyone harmed in the course of a conspiracy offense. § 3663A(a)(2). Two victims, RIAA and Lionsgate, have been identified. Although the amount of actual loss each victim suffered remains in doubt, *see infra* Part III, I am convinced that each of these two victims experienced some amount of pecuniary loss as a result of the defendant's conspiracy. The MVRA will therefore apply so long as I do not find that the number of identifiable victims or the complexity of determining causation or the amount of the victims' losses would make restitution impracticable, § 3663A(c)(3).

If the MVRA applies, the court "shall order . . . that the defendant make restitution to the victim[s] of the offense . . . ." § 3663A(a)(1). RIAA and Lionsgate, two victims of Dove's Elite Torrents conspiracy, have each submitted a Declaration

---

[2] If the defendant's crimes fell under title 18 but neither was "an offense against property," § 3663A(c)(1)(A)(ii), the Victim and Witness Protection Act of 1982, § 3663, would apply instead of the MVRA. § 3663(a)(1)(A) (stating that § 3663 applies to "an offense under [title 18] . . . other than an offense described in section 3663A(c)").

- 5 -

of Victim Losses. Under the MVRA, each victim is entitled to restitution for their actual losses. The remaining issue is whether the government has met its burden of proving the victims' actual losses.

### III

The government must prove "the amount of the loss sustained by a victim as a result of the offense" by a preponderance of the evidence. 18 U.S.C.A. § 3664(e) (West 2000); *see United States v. Searing*, 250 F.3d 665, 667 (8th Cir. 2001); *Chalupnik*, 514 F.3d at 754. "[T]he *amount* of restitution that may be awarded is limited to the victim's provable actual loss . . . ." *Id.*; *see also United States v. Messner*, 107 F.3d 1448, 1455 (10th Cir. 1997). The proper measurement of loss is lost net profit, not lost gross income. *United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006). The amount of loss for determining the proper sentencing guideline range is distinct from the amount of loss for restitution purposes. *See Messner*, 107 F.3d at 1455 (drawing a distinction between the actual or intended loss and the actual loss required for restitution under § 3663).

RIAA's Declaration of Victim Losses states that its member companies "create, manufacture and distribute approximately 90% of all legitimate sound recordings produced and sold in the United States." (RIAA Decl. of Victim Losses 2.) RIAA

provides proof that 183 sound recording albums were transferred through Dove's server a combined total of 17,281 times. Multiplying 17,281 by the average wholesale price of a digital album in 2005 ($7.22), RIAA concludes that its member companies suffered economic loss in the amount of $124,768.82. RIAA offers to accept only $47,000 if Dove agrees to "participate in a public service announcement designed to educate the public that music piracy is unlawful and has the potential to result in stiff criminal penalties." (*Id.* at 3.) The $47,000 figure represents the approximate amount of economic loss resulting from the transfers of the 20 most frequently transferred albums on Dove's server: 6,528 transfers multiplied by the average wholesale price in 2005 ($7.22) yields $47,132.16 in economic damages. There is no indication as to why RIAA reduces its monetary request to the first 20 albums as opposed to 10 or 100 albums. It is notable, though, that RIAA only proves that the first 20 albums are held by record labels that are RIAA members; there is no such proof as to the remaining 163 albums.

Lionsgate's Declaration of Victim Losses indicates that it owns the copyrights to 28 of the 700 movies Dove infringed. Lionsgate does not show any proof as to how many times those 28 titles were downloaded from Dove's server. Lionsgate states that Dove "sold over a million units" of the 700 movie titles "at $19 per unit," resulting in a "$22 million amount of loss to [the] industry." (Lionsgate Decl. of

Victim Losses 1.) From this $22 million figure representing the total loss to the movie industry, Lionsgate concludes that since it holds 4% of the movie titles at issue (28 out of 700), it should get 4% of $22 million, which is $880,000.

RIAA and Lionsgate have the same theory of loss. They assert that for each illegal download of music or movies on the Elite Torrents network, profits were diverted from legitimate sales the copyright holders could have otherwise made. A similar theory of loss from diverted profits was made by the victim in a recent Eighth Circuit case, *United States v. Chalupnik*, 514 F.3d 748 (8th Cir. 2008). In that case, the defendant gathered discarded undeliverable CDs and DVDs at the post office where he worked and sold them to used music and movie stores. He pled guilty to copyright infringement in violation of 17 U.S.C.A. § 506(a) and 18 U.S.C.A. § 2319(b)(3).

The district court in *Chalupnik* ordered the defendant to pay the copyright holder an amount equal to the defendant's documented sales proceeds, $78,818. But the court of appeals found that the government had failed to prove the amount of loss to the copyright holder and vacated the restitution award. If the defendant had not sold the disks, they would have been thrown away or destroyed, so there was no loss to the copyright holder based on the sale of those particular disks. *Chalupnik*, 514 F.3d at 755. Also, the court reasoned that since the stores the defendant sold the disks

to only purchased used, not new, products, it could not be shown that the copyright holder lost sales. *Id.* The court concluded that there may have been a collective "injury to the market" from the infusion of these CDs and DVDs, but the "large number of victims and the difficulty of determining each victim's actual loss make the collective injury inappropriate for MVRA restitution." *Id.* (citing 18 U.S.C.A. § 3663A(c)(3)).

The diverted profits theory of loss was also rejected in *United States v. Hudson*, 483 F.3d 707 (10th Cir. 2007), mostly because the counterfeit Microsoft software in that case was identified and turned over to the government by the infringing defendant's customer before any payment to the infringer. However, the court in *Hudson* also noted, "As an initial matter, we are very skeptical of the implicit suggestion that [the customer's] agreement to purchase 537 copies of the [counterfeit Microsoft] software for a total price of less than $86,000 proves that [the customer] would have agreed to purchase the same number of copies from Microsoft for more than $321,000." *Id.* at 710.

This case is similar to *Chalupnik*. Like the defendant's customers in that case (stores selling used products), the customers in this case (internet downloaders) had legal substitutes available to them. The used product stores in *Chalupnik* could have purchased used or new CDs and DVDs from different, legal sources. The

- 9 -

downloaders in this case could have purchased songs over the Internet, rented movies, borrowed DVDs from the local library, or purchased CDs or DVDs at the full purchase price. But the victims have not made any attempt to assess how many Elite Torrents downloaders would have used these various alternatives or no alternative at all.

It is a basic principle of economics that as price increases, demand decreases. Customers who download music and movies for free would not necessarily spend money to acquire the same product. Like the court in *Hudson*, I am skeptical that customers would pay $7.22 or $19 for something they got for free. Certainly 100% of the illegal downloads through Elite Torrents did not result in the loss of a sale, but both Lionsgate and RIAA estimate their losses based on this faulty assumption.

The cases cited by the government and RIAA are distinguishable from or are otherwise inapplicable to this case. For instance, both the government and RIAA cite to *United States v. Martin*, 64 F. App'x. 129 (10th Cir. 2003) (unpublished). In *Martin*, the defendant pled guilty to trafficking in counterfeit goods (Microsoft Office 2000 CDs), and was ordered to pay $395,000 in restitution for Microsoft's lost profits from diverted sales. *Id.* at 130, 131. The issue before the court was whether the defendant's waiver of his appellate rights in his written plea agreement was

enforceable, *id.* at 130, and the court found that the waiver was valid, *id.* at 132. Therefore, the court did not fully review the district court's restitution decision.

Also, the crime in *Martin*, trafficking in counterfeit Microsoft Office CDs, is distinguishable from the copyright infringement in this case. Those who download movies and music for free would not necessarily purchase those movies and music at the full purchase price, but those who *purchase* counterfeit Microsoft Office CDs are more likely to purchase the legitimate version if the counterfeit version is not available. *But see Hudson*, 483 F.3d at 710 (expressing doubt that a customer who purchased $86,000 worth of counterfeit Microsoft products would have paid the full purchase price of $321,000 for the same number of copies of the legitimate version).

RIAA cites a similar case, *United States v. Milstein*, 481 F.3d 132 (2d Cir. 2007), when it argues that "[l]ost sales are an appropriate measure of restitution in criminal cases involving the misappropriation of intellectual property." (Request for Restitution 2.) In *Milstein*, the defendant was convicted of fraudulently distributing misbranded drugs and other related crimes. The defendant purchased foreign pharmaceuticals and re-sold them in the United States with counterfeit packaging to pass them off as their domestic counterparts. *Id.* at 133-34. The defendant was ordered to pay $3.5 million in restitution to the two drug manufacturers whose trademarks he misappropriated. "This figure reflected the sales that these two

- 11 -

companies would have made if [the defendant] had actually purchased the products from them for distribution in the U.S. market." *Id.* at 135. The court upheld the restitution award, noting that the defendant did not make any claim that manufacturing costs or other costs should be deducted from lost sales to arrive at a more appropriate restitution amount. *Id.* at 137 & n.3.

The court's explanation for the restitution award in *Milstein* demonstrates a slightly different theory of loss. Instead of looking to lost sales based on what the defendant's customers would have purchased from the victim if the defendant had not been selling infringing items, the court explains the restitution award as compensation to the victim for what the defendant would have paid to the victim had he legally purchased the items for re-sale. The court in *Milstein* likely took this approach because as a practical matter, the copyright holders in that case would not have sold prescription drugs directly to consumers. This theory of loss would be difficult to apply in our case. The victims have not submitted any information as to what Dove would have had to pay the copyright owners in order to secure the right to distribute music and movies online.

RIAA cites *United States v. Chay*, 281 F.3d 682 (7th Cir. 2002), as support that the MVRA applies in this case. The defendant in *Chay* sold counterfeit versions of newly released computer games on eBay and other internet auction sites. *Id.* at 684.

The defendant pled guilty, and the court ordered him to pay $49,941.02 in restitution to the 52 victim companies, which was the amount of his gross receipts from the sale of pirated computer games. *Id.* The Seventh Circuit upheld the amount of the restitution award, reasoning that it was not an abuse of discretion for the district court to find the defendant's gross receipts approximated the victims' losses. The method of ascertaining loss used in *Chay* is inapplicable to this case because neither the government nor the victims have made any attempt to put a value on Dove's gain. Also, a defendant's gain does not always mirror the victims' loss. *See Chalupnik*, 514 F.3d at 754.

RIAA points out that restitution may include the costs the victim incurred investigating the defendant's conduct. *See United States v. Susel*, 429 F.3d 782, 784 (8th Cir. 2005). But neither RIAA's original Declaration of Victim Losses nor its subsequently submitted brief include information about how much RIAA or its members spent during their participation in the investigation and prosecution of Dove's offense.

The government admits that "[i]n each of the prior Elite Torrents prosecutions, the United States has recommended waiving restitution, pursuant to 18 U.S.C. § 3663A(c)(3)(B)" because "[t]he scope of the number of victims, and the nonuniformity of their businesses and profit models has made the process of

- 13 -

calculating restitution for all victims unduly burdensome." (Gov't's Mem. Regarding Restitution 2.) The government contends that in this case, however, RIAA has provided an adequate estimate of their diverted sales. The government admits that "there is no direct evidence that each unlawful distribution of an RIAA member company's album through the Elite Torrents network diverted a sale from that company," but insists that "the circumstantial evidence supporting RIAA's conservative estimate of actual losses is strong." *Id.* at 3. However, although it is true that someone who copies a digital version of a sound recording has little incentive to purchase the recording through legitimate means, it does not necessarily follow that the downloader would have made a legitimate purchase if the recording had not been available for free.

The government finds RIAA's estimated losses reasonable because it calculates loss based on only 20 of the 183 albums in the Elite Torrents tracker database, but there is no suggested logical basis for making the calculation based on 20 albums as opposed to 1 or 100 albums. There is no allegation, for instance, that people who downloaded those first 20 albums would have been more likely to pay the full purchase price for those albums had they not been available on the Elite Torrents network. RIAA does not aver that 6,528 out of the 17,281 total downloads from Dove's server accurately represents the number of lost sales to RIAA's members.

- 14 -

Case 2:07-cr-00015-JPJ-PMS   Document 102   Filed 11/07/08   Page 14 of 17   Pageid#: 853

It is possible that RIAA requests $47,000 because Dove's services are worth $77,768.82 to RIAA, the difference between the full amount of economic loss RIAA claims ($124,768.82) and the amount it is willing to accept if Dove agrees to participate in a public service announcement ($47,000). But RIAA does not offer this explanation. Nor does RIAA adequately prove that its members' total actual losses were $124,768.82. RIAA only proves that the first 20 of the 183 total albums on Dove's server are held by record labels that are RIAA members; there is no such proof as to the remaining 163 albums. Also, RIAA uses $7.22, the average wholesale price of a digital album in 2005, to calculate its loss, but it is unclear whether member copyright holders would receive the full $7.22 as profit or only a portion of that amount. Further, if the reason RIAA decreases its request from the alleged total economic losses of $124,768.82 to $47,000 is because Dove's services are worth $77,768.82, RIAA's request problematically assumes that every illegal download resulted in a lost sale. On the other hand, if the value of Dove's services is not the basis for RIAA's "conservative" $47,000 request, RIAA has essentially requested an arbitrary amount.

The government concedes that Lionsgate's estimate of lost profits from diverted sales is insufficient to award restitution. The government's main concern is that it would be unduly burdensome to ascertain the lost profits for each of the owners

of the 700 different film titles that were unlawfully copied and distributed. Lionsgate only holds 28 of those 700 titles.

Lionsgate's estimation of lost profits faces several additional problems. Lionsgate makes no showing of how many times its 28 titles were transferred by Dove's server, but simply concludes that it is entitled to 4% (28 out of 700) of the total damages to the movie industry. When using a diverted sales theory, the victim should show how many infringing items were actually placed into commerce in competition with legitimate items. *Beydoun*, 469 F.3d at 108. In addition, the $19 per unit price is not the appropriate figure for calculating loss, since it represents lost revenue rather than lost profits. *See id.* Finally, like RIAA, Lionsgate bases its estimate of actual loss on the faulty assumption that every illegal download resulted in a lost sale.

The cases cited by the government and RIAA offer many alternative measurements of actual loss other than diverted sales, yet all interested parties have failed to bring sufficient evidence of loss under any theory. There has certainly been some harm to the victims, but without more accurate estimates from the victims it would be very difficult to arrive at an accurate and fair number for a restitution award. The government and the victims who have come forward have failed to meet their burden of proof as to actual loss under § 3664(e). This failed attempt has

demonstrated that although there was an injury to the market, as in *Chalupnik*, the difficulty of determining each victim's actual loss makes the collective injury inappropriate for MVRA restitution. 18 U.S.C.A. § 3663A(c)(3).

IV

While there were certainly victims of the defendant's criminal conduct in this case, the amount of actual loss suffered by these victims has not been shown. Accordingly, for the reasons stated, restitution will not be ordered.

It is so **ORDERED**.

ENTER: November 7, 2008

/s/ JAMES P. JONES
Chief United States District Judge